For beginners, we gave this case 30 minutes aside, it may or may not require of that. But in the ultimate act of futility, I want to suggest to attorneys that they don't necessarily have to use all of the time they've been given. I might as well go try to whistle against a hurricane, but I feel like being totally useless today so I'll give that advice to you. You may have pleased the court. My name is Elliot Shukart. I'm an attorney. I'm appearing on behalf of myself in this case. I would like to reserve 10 minutes if that's acceptable. Okay, why am I not surprised? Okay. All right. Okay. And I don't anticipate using the entire amount of time. Okay. We're here on a very topical issue in which the plaintiff is contending that the federal government is engaging in bulk collection of email in violation of the Fourth Amendment of the United States Constitution. On remand, did you request additional jurisdictional discovery? Or did you? I don't understand. Did you request additional jurisdictional discovery on remand when we sent this back to the court? Yes. When it was remanded the last time, I did not request additional jurisdictional discovery. And that was because the opinion from the appellate court had indicated that discovery should be very, very circumscribed in this case and that it would not be possible to probe the inner workings of the national security establishment. Well, it's hard for me to understand where you're getting that from. So I looked at the opinion again this morning. You could read it very, very narrowly with an intent toward finding that in the language and find it there. But you could also read the opinion in such a way as to suggest that all Judge Harbin was doing was taking into account the realities here, that you might be stepping on some national security landmines, and the district court judge should be mindful of that in deciding what discovery to allow and how to allow it. That doesn't mean you can't ask for and try to do things like qualify your experts as experts, to get into the Stoughton documents, and things like that, which seems at a minimal, may have been helpful to you, if they could be qualified as experts. That's right. And if the court were to remand, we would definitely be asking for jurisdictional discovery if the case is still on jurisdictional issues. I've talked this through with my expert witnesses, and they've indicated that we could be asking for things such as, does the government have my own email, or does the government have my expert's email, and does the government deny various things? And I think that it would be possible to get into this and to probe these questions in a way that would be consistent with... But why didn't you do that? That's very consistent within the language of our opinion remanding it. The first thing you might do is serve an interrogatory on them. Do you have any of my emails? When were they sent? Who were they addressed to? How many of them do you have? What servers were used? What IP addresses were surveilled to get them? And then with the interrogatories. Yes, because we're only dealing with a very low standard of evidence here in connection with the government's request to dismiss on subject matter jurisdiction. And the case law says that these types of cases should only be dismissed if they're deemed to be absolutely trivial in a case such as this. They don't say... Clapper clearly didn't deal with the triviality. That was a hugely important case. So I'm not sure we're getting to only be dismissed if they're trivial. And maybe only if the factual allegations are so implausible. And you're beating trivial into the word implausible because we do talk about possibility. But I'm not sure whether that word trivial is... Maybe I missed it, but I'm not sure where that's coming from. Okay. Yeah. And I dug into the case law concerning the standard of proof and what the test should actually be on this case. The test for what? I'm sorry? The test for what? The test for plausibility. So in other words, we did... Plausibility. We're beyond it being trombo. If you start talking plausibility, you're going down that road. Let's forget about that because our initial opinion said that the allegations here are plausible on their face. The problem is not facial plausibility. No, the facts. But factual jurisdiction. That's what I'm trying to get to. And that's why I suggested a simple set of intermogatories asking, look, do you have my e-mails? When to get them? What do they pertain to? What was the IP address that was surveilled? What was the provider that was surveilled? Who were they addressed to? That simple kind of intermogatory, they could come back with national security. They might not. But absent that, how do you overcome the standing bar? Oh, I think... And you didn't even believe that. I did believe that we easily overcome standing on the basis of the evidence we've submitted already. What evidence? You've got three things. You've got the slides with the Snowden documents. You've got the editorials and the articles. And then you've got Binney and Wiebe affidavits. Yes, that's right. And they haven't been around at the NSA or wherever since 2001. And none of that's admissible. Okay. Yes. We're submitting the Binney affidavit on two different grounds. First, we're contending that Mr. Binney has actual knowledge concerning what is going on. It is true. He has not worked at the NSA since 2001. But nevertheless, he has worked in the security apparatus worldwide since that time. He has consulted with a number of European governments throughout that time. Why not qualify him as an expert? Why not ask for a doctorate or something? Qualify the guy as an expert. Then you get past some of the problems with opinions and hearsay. And maybe you can't get past all that. But it's a lot easier if you can get him qualified as an expert on the basis that you're having to ask him. That's right. And the trial court did not hold a hearing on this in order to address any of these issues at all. Did you ask for one? That's a really simple question. That's not esoteric at all. Did you ask for one? If there's any part of that question you don't understand, let me know. But I assume you know what did means. You, Mr. Shugart, or not the number, one, the number. Did you ask for one? Right. In answer to Your Honor's question, we did not ask for a hearing. But I would like to focus on the actual test. Did you present him as an expert witness? We submitted his affidavit on the grounds that he was an expert witness and also on the grounds that he had actual knowledge of what was going on. Back up on that. Answer her question more directly. Because I didn't get until you just said that, that the affidavit was tendered on the basis of being the report of an expert. You could make that argument and probably should have made the argument, but you're being asked whether or not you offered it for that reason, for the report of an expert. Was that the reason you submitted the affidavit? Well, yes. We were submitting it on the basis of his actual knowledge of the statements in the affidavit itself. That's not an expert. Okay, that's not an expert. I'm sorry? That is not an expert. But in addition on the grounds that he was an expert. Well, I mean, you don't just throw it up in the air and say, I like that one. Well, maybe you do. See if it sticks. But I would like to focus on the test that we should be looking at. Because the trial court used a preponderance of the evidence test, and the trial court went ahead and conducted a trial behind everybody's backs on the basis of these two dueling affidavits. And the trial court says three separate times, possibly more, that the test is a preponderance of the evidence. But that's not the test, because the test here is that there's case law that says that if the issue in a motion to dismiss pursuant to 12B1 on subject matter jurisdiction grounds, if it's the same issue as the ultimate test on the merits, then the court is to assume jurisdiction and address this matter pursuant to 12B6 or summary judgment. But it isn't the same test. We do believe it's the exact same issue. We're here to address a factual. The issue of standing is whether you've been injured. I can give you the, you know, there is a definition. And one of the ways of proving that is that your e-mails have been looked at by NSA. Right. And what have you done to prove that? Okay. We have submitted testimony from a person who knows the system, that the system is collecting all of the e-mail within the domestic e-mail. Okay. And that issue was before the court before, right? Or is that new? It was before the court before on a facial basis, but not with any kind of affidavit. As to you for standing on a facial basis. That's one thing. As to you for standing. Judge Ambrose has discussed the weaknesses. Or maybe it was Judge McKee of the evidence. You look so much like everyone defuses us. We're both Browns fans. And so, you know. But the issue of whether you yourself, your e-mails, have been subject to examination by NSA is not the general question. It's a specific question. It's something we need to deal with to determine if you have standing. And I can't see where you dealt with it except in very broad, generalized statements by people who weren't even with the NSA at the time that these things happened. So I don't think you can throw us off the issue of your standing by saying the issues are the same. Well, I suppose it would be possible to prove that in two different ways. We could either send them a discovery request and say, please send us everything at the point in the past. But you had that chance and you didn't do it. That's correct. That's correct. Or we could choose the path, which I did choose to do, which is to submit affidavits for people claiming actual knowledge of the system, saying that the system is intaking all of the domestic e-mail. And that was the path that I chose to do, on the assumption that I was going to be blocked by some sort of national security defense and the statement in the court's prior opinion. But because they haven't been there in 18 years, you need to have something that in effect qualifies them as an expert, and you didn't attempt to do that. Right, but they're submitting this on actual knowledge. Because Mr. Binney has testified before. A whole lot's changed since 2001. That's right. These people have been working with European governments as of 2016, 17, 18. Mr. Binney's been working with the British House of Lords. He's worked with the Belgian parliament. He's worked with the German Bundestag. If you work with the Russians, you might be able to argue that he would know what the U.S. was doing. But that's not the case. So how does his work with some foreign governments help him here, help you here? Because from his consulting work for these governments, he understands what the American system is. Well, that would be hearsay in and of itself, wouldn't it? Yeah. I'm sorry, what was the question? That would be hearsay. If the British told them what the U.S. was doing, that doesn't help you. This is not like Clapper in the Second Circuit, where the court acknowledged that the program's existence and acknowledged that that particular individual's calls, whatever, were among those collected. Government isn't conceding that here. And so you need to have something that, I mean, what they're basically saying under, I guess, the Lujan test, there's no injury to you that you have yet shown in order to have 12B1 jurisdiction. And I am contending that this is possible. If the court were to remand this for purposes of discovery, then we would send that discovery request in order to nail this down. Well, you had your chance to do that. That is correct. But I would argue that this is an issue that is highly important, and the American people want to know what is going on. We are not a court to provide information for, quote, people who want to know what's going on, unquote. We are here to hear legal issues from people who have standing to present them. So you have to show you've got standing, you yourself. Right. But if we look at the case law, I would, I mean, you could test. What you've got is general information, third hand, from student to journalist to you, and relating to some slides. You've got some editorials, articles, which in and of themselves are not going to do anything. They don't prove anything. So you really have to come down to Binney and Wiebe, and they're saying we haven't been there in 18 years, but we understand the process here, and the process tells us that pretty much everybody is being picked up, whether you call it metadata or whatever. And then the question becomes, are you among those that specifically, who have information being collected by the, in this case, NSA, I guess. I would still argue that the test is different. It's not a preponderance of the evidence test, because we're looking at an issue that is identical. An issue for subject matter jurisdiction is the government collecting plaintiff's email is identical to the ultimate issue for why you're doing it. You're arguing a kind of relaxed inquiry because of, you're saying that the jurisdictional issues and the merits are so intertwined that there should be, it's a doctrine we haven't totally adopted. But even if you're right, you still have to, it seems to me, answer what Judge Ambrose and my colleague Judge Roth are asking you about Article III injury, even under a relaxed approach to having the merits and the injury intertwined. That is correct. This Court has repeatedly said, and I'm reading here, we have repeatedly cautioned against allowing a 12B1 motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits, which is exactly what's been going on here. We were given very little time in order to conduct, in order to do discovery. Well, did you ask for an extension? Yes, but. Well, did you ask for an extension? No, Your Honor. We did not ask for an extension. But nevertheless, we didn't expect to be litigating the entire case in a handful of months. No, nor were you, as I'm saying. You had him with an interrogatory, your name. Did you guys have any chance to have him to see my e-mail, intercept it, read it? That's not, one, does take a great deal of time. You might get stonewalled at that point, and if so, then you can go back to the Court and pursue it from there. But it seems to me you've got to do something to establish your Article III standing, your injury. Right, but the case law says that when the issue is the same at a 12B1 motion as ultimate issue, as it is in this case, then the Court is to presume jurisdiction exists and move on to the merits. Wouldn't it be a case that says we should presume our Article III powers?  And use the language. Yes. Dismissal via 12B1 factual challenge to standing. What case is this? Which case is this? This is Davis versus Wells Fargo, 824F333, 2016 case. And it says, dismissal, this is a quote, dismissal via Rule 12B1 factual challenge to standing should be granted sparingly. When a case raises a disputed factual issue that goes both to the merits and to jurisdiction, district courts must demand less in the way of jurisdictional proof than would be appropriate at a trial stage. What page are you on in Davis? I'm sorry, Your Honor. The page. Oh, okay. This is at 350. But the fact that district courts should demand less does not mean that they should demand nothing in terms of establishing individualized injury. I have case law that says that it should demand nothing. CNA versus United States, 535F3132. What did I write in CNA that supports you? Okay. Yeah. All right. You're probably watching a brown screen. Okay. Quote. This is a page. Okay. Where the defendant's challenge to a court's jurisdiction. What page are you on? 143, 144, what? Oh, it's at 143. I do have the site here. And what are you? Okay. Quote. Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of the federal cause of action, i.e. merits. The proper course of action for the district court is to find that jurisdiction exists and to deal with the objection as a direct attack on the merits in the plaintiff's case. And then we go on. I think what I wrote is that when you have jurisdiction and the merits that are intertwined, you can do some discovery. It need not necessarily be as much discovery as you would do on the full-fledged merits if that were just being dealt with solely. But what we're saying to you is whether it be less than the type of full-fledged discovery that you would need, you've got discovery here that is hearsay and it's at 12B1. Unlike 12B6, it can be inadmissible. And if the judge here rules in her discretion that it's inadmissible, what do you have that's admissible that would be carry the day for you for showing that you should get by a 12B1 challenge as to subject matter jurisdiction? Or how can you make that inadmissible evidence admissible at trial? Yeah. Okay. The case law says that the 12B1 issue is presumed jurisdiction and that we move on and treat it as a 12B6 motion, which assumes the plaintiff's facts are true and addresses it as a matter of law. There is a difference. At 12B6, you assume the allegations are true, similar to what you had when you had the facial challenge. At 12B1, it's not necessarily the same way. You have to put in some evidence that shows that, in effect, back to what Judge Ross said at the outset, you've got to show somehow you've been injured. Yes. Well, there seems to be – and the case law seems to address two possible standards. The CNA seems to say that we assume that the jurisdiction exists. In Davis, it says that we look for some small amount. We demand less in terms of jurisdictional proof. A suit may be dismissed for want of jurisdiction. This is Davis at 349, where the alleged claim appears to be immaterial or where such a claim is wholly insubstantial and frivolous. Now, I would submit that this case does not fall into the frivolous – Don't say that your concern is frivolous. No, not at all. Not at all. What we're saying is what do you have out there that might show a significant possibility that you were monitored and you've been injured? Okay, well – With admissible evidence. In other words, you don't – you can't have these persons currently as they are because they're not experts. Okay. The articles and the editorials don't qualify, and the Snowden documents, in effect, don't qualify either. Because they were given from Snowden to journalists to you. That's hearsay, right? Well, I suppose, yes. Okay. We have my own testimony as to the disclosure that was made to me by the government scientists. That sounds like hearsay. It's an admission of a party opponent. All right. That's my argument. And you put that in when, in your reply brief? That's correct. It was in my reply brief. It's a tad late. Right, right. But nevertheless, in light of the public importance of this case, and in light of the fact that we have Edward Snowden on the major national media saying that he was able to wiretap everybody, I think it would be prudent for the case to move forward so that I could go back and conduct this jurisdictional discovery to show what the government does have on my own e-mails. Well, you say private time. You're not talking about capturing metadata now. You're talking about capturing the substance of the communications, not just the headers. Is that what you're – That's right. I'm talking about, right, not the metadata, but we're talking about collection of actual content and that it's going into a central database for purposes of being data mined. Okay. You reserved a chunk of time for rebuttal. So if you feel obligated to it, we'll hear you back. Let's hear what your opponent has to say. All right. Good afternoon, and may it please the Court. My name is Joseph Busa, and I'm here on behalf of the government. I don't plan to take nearly all my full time. On the issue of standing, I believe the Court has it well in hand just on the briefs alone. So I would like to begin by addressing the questions that this Court raised in the letter to counsel on Thursday about sort of what standards apply and what procedure was proper in the district court. I have three buckets of answers to those questions, and I'll just march through all three briefly, and then I'm happy to take questions on that or any other issue in the case. So first, it was not error for the district court to apply the procedures that this court prescribed in the first appeal, which is that, look, on remand, the government will have an opportunity to mount a factual challenge, which is what we did. We introduced unambiguous evidence that the lynchpin jurisdictional allegation is not true and the government is not collecting all or substantially all Americans' e-mails. What would the district court have to prove to make his case under 12b-1? So I think at a minimum, he would have had to come back with admissible evidence to even raise a question of fact regarding standing that would require resolution by the district court. And he did not do that. Be more specific. That's generic he would have to show. But can you be more specific than that? Given the allegations here, what would he have to show? Oh, he would have to have. So even to get to factual resolution by the district court saying, look, I've got evidence here. I've got evidence here. I'm going to weigh it and determine whether, you know, he's been injured and therefore has standing and can go forward. You would have to introduce some evidence. Right. And we just don't have any evidence of what? Oh, I'm sorry, that his e-mails were collected or that everybody's e-mails were collected. And that's why we know that his e-mails were collected. I'm conceding that if he shows they were collected, that's sufficient. That's why I asked the metadata question. If they were collected, that's enough for Article III. So that's the basis on which the case has been litigated, and we're not disputing that at this time, that at the minimum what he would have to do is show that he has been injured in the way he alleges, which is that his e-mails were collected. And he's introduced no evidence to that effect. So, you know, whatever standard applies, whether it's the traditional 12B1 standards or one of the reduced standards in a case of intertwined jurisdictional and merits facts, it actually doesn't matter because under any standard what we have is unambiguous evidence that we do not engage in bulk collection of all or substantially all of Americans' e-mails. That's his linchpin jurisdictional allegation. Why should they? What you're saying is trust us. Your Honor, we're simply asking for you to apply the normal standards in any civil litigation, which is that when the defendant mounts a factual attack to standing and puts forth competent evidence showing that there is no standing, at that point plaintiff has an obligation to come forward with at a bare minimum some evidence, even get the toe in the door to whether the district court can then resolve, you know, the evidence and weigh it and determine whether he was injured at all. In terms of the affidavits they did submit, the Briney and Levy, I guess it was, affidavits, if you've got affidavits from someone who designed the system, even though it was designed, a system, I won't say the system, a system for capturing extensively metadata, let's leave it at that for a second because I'm not clear of my mind if we've gone beyond that, of everybody who uses certain servers and those servers now are underpriced and ubiquitous and they know how that program works. Why wouldn't their testimony as to how the program they designed and generally how the principles that they applied to design that program, why wouldn't that be something akin to an expert report? So, Your Honor, the Briney affidavit, which I believe you're referring to here, says that, you know, over 18 years ago when Mr. Briney last worked at the NSA, he participated in the development of what he calls thin thread. Now, he doesn't say this involved the bulk collection of all or substantially all Americans' e-mails. He doesn't even say that thin thread was implemented. In fact, he says thin thread involved what Mr. Shuchart says would be lawful under the Fourth Amendment. Thin thread would be what, I'm sorry? I believe that the Briney affidavit says that the thin thread program that he says he's describing, you know, he never says it was implemented and he also says it does not involve the bulk collection of all or substantially all Americans' e-mails. To the contrary, he says it involved what Mr. Shuchart says would be lawful under the Fourth Amendment. So at most, I believe that's what he's describing in his affidavit. He says there was a program called thin thread that involved collection of metadata. He also says that, you know, to implement that, the NSA developed the capability of intercepting information from fiber optic cables. Now, the fact that he says he was involved in the development of that, that says nothing whatsoever about whether the government is in fact using that capability to collect all or substantially all of Americans' e-mails. And that's because, you know, we've offered, again, competent evidence unambiguously providing that the government does not do that, whether under PRISM or any other NSA collection program. Has the policy changed since ACLU v. Clapper? I mean, there was an acknowledgment that there was a program and that the persons that were involved in that had their information collected. What's changed since then? So there, the government did acknowledge, you know, one, I believe, collection order regarding VBNS and said, yes, we were, you know, collecting that information and conceded it there. You know, I don't think there was a policy change here. If you just look at the United States Supreme Court's opinion in Amnesty International v. Clapper, there the United States, again, didn't, you know, sort of put forward, oh, well, we concede there was interception here. We say there wasn't interception here. You know, there the Supreme Court made clear that the plaintiff has the burden to prove standing. And it's not the government's job to come forward and tell every plaintiff whether or not they've ever been collected against. You know, that information is highly classified, highly sensitive, for reasons explained in the Supreme Court's Amnesty International opinion. You know, if it were the case. I said ACLU. Is that wrong? I said Amnesty International. I believe you're talking about the Second Circuit case. Yeah, yeah. So in the Supreme Court case, Amnesty International v. Clapper, it's charging the same, it's about the same program, 702 collection, right? The Supreme Court said, Justice Alito writing for the majority, look, it would be very dangerous to allow any plaintiff to file suit and then demand to learn from the government whether or not they've ever been surveilled under an alleged program. A different question, it seems to me. We never got that far because the request was never made. Exactly. Had it been made, then maybe we could have gotten our arms around that. But that request was never made. That's exactly right, Your Honor. And the plaintiff had every opportunity to make that request on remand and simply did not. And there's no error for a district court not to grant sua sponte, discovery, that a plaintiff never even requested. But the opportunity for discovery is important here regarding the applicable standard in district court. You know, this court's case law about intimate intertwining between jurisdictional facts and merits facts, it's all about protecting plaintiffs and making sure they get the benefit of the pleading standards, Iqbal and Twombly, before discovery. All of those cases you cited in your letter, those are about pre-discovery factual challenges to a plaintiff's standing. Those concerns aren't implicated here. It's time for facts. As this court said the last time we were here on appeal, plaintiff had every opportunity to take discovery. And there's no prejudice to plaintiff when he rests on his own evidence, but it turns out he doesn't have any evidence that meets and controverts the government's unambiguous evidence on standing. Under those circumstances, there's no error in the district court. How does somebody go about doing this in the future? In other words, how do you show that there's enough to meet a 12B1 motion to dismiss? It's very difficult because you don't have the information. You're trying to get it. That's my concern, too. What happens if we get to a point, let's assume for a second that the allegations here are true. It's a bad hypothetical because there's so many planks to that bridge that are absent, like the request, a more specific request. But if that kind of national, all-encompassing surveillance had been going on, how could one individual citizen, John Q or Jane Q, possibly bring a suit to get a handle on that? So I don't think we know yet, but the Supreme Court has been very clear that the question of whether some other plaintiff might or might not be able to establish standing has no bearing on the question of whether the plaintiff before the court actually has to. I know you're basically saying McKee showed up, but answer the question anyhow. Your Honor, I don't mean to be implying that at all. No, you said it very politely, but you're basically saying my question is totally irrelevant. That's why it's a hypothetical. When you ask a question, the attorney goes, Your Honor, that's not this case. I know it's not this case. That's why it's a hypothetical question. Well, I don't mean to be dodging the question at all. We're just teasing you. I think it might be very difficult for any plaintiff to make out standing in a case like this, but that is because 702 collection is about what we say it's about in our sworn testimony and always have. It's targeted collection of non-U.S. persons located abroad who have information about terrorism or other foreign intelligence information. In those circumstances, it will be very difficult for a plaintiff to make out standing when what they say is, Actually, I think the government's taking everything, but I have no evidence as to why that would be the case. Could we be at all concerned about that? Especially in thinking about what it was the Chief Justice who made certain remarks in the Department of Commerce case and the census case. Should we at all be concerned about what may be a lack of government candor in these kinds of proceedings? When the government says, We're not doing that. That's what I asked your opponent there. Is litigation now in these kinds of cases to be based upon the theory of just trust us? Absolutely not, Your Honor, and I want to just be very clear. The government has been as candid as it can be in an unclassified setting, and it has said unambiguously, we do not engage in the bulk collection of all or substantially all Americans' e-mails. I know you said that, but the question I have in mind is, why should he have to accept that response or that representation, especially given some of the litigation history in other cases? Why should any plaintiff have to accept that representation? It's the burden on any plaintiff seeking to withstand a factual challenge to standing to come forward with evidence showing the plaintiff has standing, and the plaintiff's not done that here. And to give the court some comfort, this case isn't the only case involving these programs. There's the Wikimedia case in the Fourth Circuit, the Jewell case in the Ninth Circuit. Those plaintiffs have gone much farther than this plaintiff ever did. Now, of course, we're going to have our argument. Where is that? Because they're the ones standing, right? Where is that case now, do you know? I'm sorry, which case? The Jewell case. The Jewell case. So I believe, last I heard, that the Jewell plaintiffs had had their cases dismissed for lack of standing and that that appeal is before the Ninth Circuit right now, waiting for briefing. The Wikimedia case, I think, is most instructive. Didn't Jewell involve facial standing? I believe that was a factual challenge in that case in which we prevailed before the Ninth Circuit, Your Honor. I thought it in the Wikipedia involved facial challenges. So the Wikimedia case, the first appeal there was a facial challenge. On remand, I believe that we mounted a factual challenge to standing. I believe that is still pending in the district court. Yeah, I'm thinking of the 2011 case in Jewell. Obviously, a lot's happened since then. Jewell has had a very complicated procedural history, Your Honor. But I also want to highlight the Privacy and Civil Liberties Oversight Board is an independent agency of the United States government. Let me ask about that. I thought very significant and profound, and I was surprised that not more was made here. But I wanted to ask, what exactly is the nature of the PCLOB, I guess it is, and is its report in the record? I know it's on the website, and my clerk sent it to me a little while ago. I haven't had a chance to read it yet. But is that in the record, or is it something we can take judicial notice of? You could take judicial notice of it, but we specifically incorporated it into the record by discussing it and citing it in Mr. Murphy's affidavit. That's the affidavit of the director of the NSA. And so the PCLOB, as it's called, the P-C-L-O-B, is an independent government agency set up to conduct oversight over these very issues and to look into whether there are privacy or civil liberties problems with the government's collection to make sure the government's collection is within legal bounds. And the PCLOB's report from 2014 says exactly what Mr. Murphy's affidavit here says, which is that 702 collection, it is about the targeted acquisition of certain communications of non-U.S. persons located abroad who have terrorist information or other foreign intelligence information. And so you have some very real corroboration from an official report from the board that has oversight over these issues. And moreover, the government, of course, in all of this, is superintended by the Foreign Intelligence Surveillance Court. That's an Article III court set up by Congress by statute. And they sit over all of these programs, 702 program, the targeted collection. And so this is not an instance in which we're just asking you to take our word for it. There are very real safeguards. When you use the word collection, do you mean targeted? In other words, is there – there was evidence years ago that there would be general metadata, and if certain words were used, that they could – it would be flagged, and then they could be looked at more closely later in terms of communications between a citizen and somebody in a foreign country, for example. Is that metadata not what you deem to be – if that's true, not what you deem to be targeted? I'm not sure I fully understood the question, but I think it might help. Once upon a time, I recall that there was a former official at NSA that said there is metadata that basically runs through a computer. Not that any human sees it. The computer flags certain words. Those certain words could lead to another layer of review. Now, is that metadata? I thought metadata was to, from, the date, the length. I believe that's the general description of metadata. I'm not actually familiar with what you're describing now, Your Honor, Judge Ambrose, about flagging in keywords and then collection, but I think I should just talk about what targeted collection means under PRISM and upstream, but PRISM also. And that is, let's say we have an analyst, and they've identified an electronic communications selector that is reasonably believed to be associated with a non-U.S. person, say a terrorist. Wait a second. When you say an electronic communications selector, is that basically a logarithm that is programmed to define certain combinations of digits? It's basically an e-mail address, Your Honor. So let's say we have an NSA analyst, and they've identified an e-mail address that they believe a terrorist located abroad, not a U.S. person, is using. And that collection from that e-mail address, e-mails to and from, would result in foreign intelligence information. The NSA analyst would then go through a targeting analysis as to whether, you know, let's confirm, is that person a non-U.S. person located abroad? Will this collection reasonably result in, you know, foreign intelligence information? Then, under the PRISM program, the NSA analyst, after some review internally, can send a directive to the relevant e-mail provider that compels the provider to give to the government the e-mails to or from that selected e-mail address. That's targeted collection. And what Plaintiff here says is, that's not what PRISM is about at all. He says, actually, the government's getting everything. They're getting all of these e-mails. And what we've shown to be true is that that's just not the case. We engage in targeted collection from non-U.S. persons located abroad under 702 and PRISM. And he's introduced no evidence that would meet or controvert that. For that very simple reason, he lacks standing. You know, the last time around, the Iqbal and Twombly pleading standards apply. But this court made clear that it's time for facts and that Plaintiff has to come up with admissible evidence showing that he has standing, that his e-mails have been collected. You know, he made no attempt to show that there's any reason we would have been actually getting his e-mails in particular. So what he has to show is that we're getting everyone's. If Finney and Weavey had just left in 2018 and they said we're familiar with the process and based on information that we have received from the plaintiff here, we believe that it is highly likely that this plaintiff would have been reviewed as a targeted person for review, not necessarily for any type of indictment or anything like that, but just a person that's been identified for further review. Would that qualify as meeting the standing under 12B1? I think it certainly gets closer, right? I don't think I can just come out and say, yes, that would definitely be enough. And I think it turns on that highly likely phrase that you framed there. I believe that under the Supreme Court's opinion in Amnesty International against Clapper, standard is actually certainty in this kind of context. Under Spokio, though, it would be Spokio. Very different factual situation. Read that into the Clapper language. And if you have under Spokio a sufficient likelihood of an injury, even if it's an intangible injury, doesn't that get you over that bridge? So the Supreme Court in Amnesty International against Clapper, it has a footnote that actually helpfully sort of parses this out. Again, in the Clapper case, the Supreme Court said, we demand certainty about collection for standing purposes. It says in a footnote, we realize that in some other cases we have talked about reasonable probability or likelihood. I don't remember the exact verbal phrase. Spokio is after Clapper. And what they say there is saying, look, we're going to apply the certainty standard here. And that makes sense when you think about the different types of cases that are going on here. And the reasonable certainty type cases, Your Honor, there, there tends to be no dispute about the government's actual conduct. And the only question then is whether that's reasonably anticipated to harm the person. Right. And so the question in that scenario would be, you know, let's say Mr. Foucault has bulletproof evidence that we collected his e-mails. You then have to show that that harms him in some way. Who knows what that inquiry is going to look like. So there you get a point of amendment push. Exactly, exactly. But that would be part of the mix there. But the question here, where there actually is no certainty as to what the government is doing, there's no, quote, actual conduct in the language of those cases, what the plaintiff has to do is show, you know, with certainty that the government is engaging in the conduct that they allege, that's the bare minimum of standing. And that's the standard that should apply here. And that's the only hesitation I have, Your Honor, in responding to your hypotheticals. I'm not sure the standard was exactly right. But certainly that would be closer. And that would be, you know, an issue for the district court to resolve then. There would then be, you know, some factual question that might need some factual resolution. But that's not at all what we have here. Let me ask this. This may be beyond the record. And if it is, and I'll ask your point, the same question. If it is, then we can't go anywhere with it. But I'm trying to figure out in my own mind, just technologically, how would this be done because of the way packets, because of the packeting method by which e-mails bounce around the universe to get from, say, from here to New Jersey. Where would the intuition have to be placed? Is it that when I send an e-mail through a Gmail, when it initially hits the first Google server right there, I assume it's intact. So if you intercept there, you get the entire message, as opposed to getting it further down the line? Is that where you have to apply the listening device, whatever it is? The PRISM program goes to the end of the stream. This has been described in the PCLOG report and in our affidavit. It goes to the electronic communications service provider, the e-mail service provider. So you use the Gmail example. And, again, I cannot possibly confirm or deny what service providers ever received a 702 directive for reasons explained relating to national security in our affidavit. But, you know, so PRISM collection happens, you know, from the electronic communications service provider. If you're saying it goes to the service provider that sends the final link to the recipient, then that would make sense, because there the packets are reassembled into a message. So that would make sense. You know, the upstream program we've publicly described is happening upstream of that end service provider. We've described it as happening over the Internet backbone, right? And that's, you know, we can't get into the technical details of how that communication happens. You know, that's, of course, highly classified information. But I want to highlight one important thing here is that, look, plaintiff here now wants to make this case about upstream. And we've said, look, neither under PRISM nor any other program does what he says happens happen. But just to be clear about what other plaintiffs have been able to do regarding upstream, the individual plaintiffs in the Wikimedia case came up with all these allegations about how the Internet works, you know, where these so-called backbone locations are, in their view, the technical means the government they think is using to engage in upstream collection. And even with all of those allegations, at the 12B6 standard, with the Iqbal plausibility requirement, the Fourth Circuit held that those individual plaintiffs had failed to even plausibly assert that their emails must, therefore, have been collected by the NSA, even assuming all of that information to be true. It only gave standing to a giant website that claimed one trillion Internet transaction communications with a user base spread all over the globe. That's the kind of allegation the Fourth Circuit required for standing at the plausibility stage. And plaintiff's allegations here, even if you fairly read upstream into the complaint, come nowhere near that, even on a plausibility challenge. And when it comes time to proof, our proof directly refutes what he alleges. Neither under PRISM, nor upstream, nor any other program, does the NSA engage in the bulk collection of all or substantially all Americans' emails. And for that reason, the district court simply didn't err in saying, look, I've got evidence here, I've got no evidence on the other side, therefore, plaintiff has failed to withstand this factual attack to his standing. And if there are no further questions, we ask that you affirm. Thank you. I did take a look through the evidence that I have in answer to some of the court's prior questions. And there is one additional thing that I wanted to mention that does support the plausibility standard here. In 2013, the NSA Inspector General, George Ellard, E-L-L-A-R-D, disclosed in a letter to Senator Charles Grassley that the NSA staffers had queried this database, this X-key score database, and that they had dug into it, and they were looking at the content of the email of their lovers or their love interests. So this, I believe, is a disclosure that the full content of domestic email is in that database. And I think that that's one additional reason as to why the allegations are plausible. In addition, in response to what the government's argument was, they're trying to hold up two insurance policies. And they're saying, first, we've got this affidavit from Mr. Murphy, saying that we're not doing this, and it's got this wonderful corporate language, all or substantially all, we're not collecting email. But if we dig down into that phrase, all or substantially all, well, if, say, they're dropping off all of the email from 2008 because they haven't yet finished the Bluffdale data repository, or they haven't finished the three times larger one that they're currently building at Fort Meade, then Mr. Murphy's affidavit is technically true. They're not collecting all or substantially all because they've just jettisoned the 2008 and earlier emails. But what it does suggest is that there is an admissible document, and you maybe can try to punch holes in it. But on your side, the court found that there was nothing that would be admissible. Well, Your Honor, that standard is extremely low, as I've argued. The standard is either zero or trivial. So it doesn't take much in order to get over that burden of proof. And there's four cases that were cited in the court's memo. It doesn't take much to get over that threshold of what might be admissible. But in this case, so far, you haven't done it. Your Honor, I think that we've submitted a great deal of circumstantial evidence that bulk collection is occurring and that they're taking in virtually all or substantially all of current domestic email for the reasons previously stated. My own testimony, the expert testimony, my two witnesses based on the Snowden documents, the admissions of the United States House of Representatives that those documents were authentic, the admission of James Clapper that those documents are authentic as well. So I think there's a huge amount of circumstantial evidence that this program does exist and is occurring and that it gets us over the standard of either assumed jurisdiction, pursuant to the CNA case, or that this is more than a trivial allegation, pursuant to those other two or three cases that we've been talking about. The second insurance policy that they're talking about is the so-called Privacy and Civil Liberties Board, where they're claiming that we already had a group of citizens come in and they've taken a look at what's going on over here and they've rubber-stamped it and they say this is not happening and everything is fine and kosher. But that's not, in fact, what the Privacy Board found. The Privacy Board actually states that the government is presently unable to assess the scope of incidental collection of U.S. persons under the program. They don't even disclose to their own fig leaf board the scope of what's going on. Incidental, though, is a very, very significant qualifier there. It sounds like they're saying that in terms of the government's representation about who's being targeted, yes, that's who's being targeted and it's as Mr. Russo represented to us. In the process of that targeted collection of data, be it metadata or something beyond that, it's possible that there will be incidental, to use the report's word, discovery, and I don't mean discovery in the technical legal sense, but just revelation of other people who are either communicating with them or maybe somehow the packets getting mixed up. That's what I'm interpreting that to mean. Now, maybe that's wrong, but it sounds to me like that's what they're saying there. They're not saying that because the program exists that there's an exception which follows the rule and everybody's communication is being intercepted. That's not even close. Well, yes, and that's a possible interpretation, Your Honor, as to what they're saying, but I think the language in the Privacy Board's report doesn't come out and specifically say that this is constitutional and that they are not doing it. Well, how could they? I mean, it's a group of citizens. How great would that have? They say it's constitutional. So what? They say it's constitutional. Well, yes. Yes, and in fact, the Board does say, the Board has found that certain aspects of the program's implementation raise privacy concerns and certain aspects of the program push the program close to the line of constitutional reasonableness. So the Board itself recommended that there be reforms within the system and we see no evidence that those reforms have, in fact. You know, that's a whole different. In terms of whether they could tighten it up or perfect it, I don't know enough about it. I don't think anybody in this room, maybe even Mr. Boussa knows enough about it to suggest that. My guess is if he were asked, he would say, yeah, the system is probably not perfect and it could probably be tightened up here and there. But that does not help you, Mr. Schuchart, get to Article III, standing no matter how high we set that hurdle. It's got to be there or else we write Article III out of the Constitution and we become a very, very powerful institution. There's got to be some showing of injury and that's what we're wrestling with. Injury to you. It is not a class action. Right. But the Court has repeatedly cautioned that we're not to try the case in a preliminary motion such as this. And we've talked about the importance of discovery in this case and we've talked about the fact that we have not yet done discovery in this case. So... But that's part of your problem because the opportunity was there to do the discovery, jurisdictional discovery. Are you saying that you asked for, I mean, you said you did not ask for discovery, but discovery was offered or there was the opportunity to request it. Nobody said you can't request further discovery. That's correct. But, right. We have submitted our argument that we have evidence that is a dragnet program and we had the impression that discovery was not going to be permitted, which is why it was not done. Don't you have to test that? Well, the language from the prior opinion was fairly clear that discovery would not be permitted to probe into the workings of the national security apparatus. If that was not the understanding, I would very much like to go back and conduct that discovery. But there was clearly a misunderstanding on my part as to what the instruction was. Okay. I'm looking at the opinion before now. I can understand how one could, in theory, get that interpretation from what we said. As I said earlier, the court was just kind of worried about not saying anything in the opinion that would create an issue of the district court interpreting us, requiring the district court to do something that would conflict with legitimate privilege or national security concerns. We do understand your argument, and you've got a minute or two left. It took a lot of time for rebuttal. Unless you're really dying to say something, we'll take your matter under advisement. Thank you, Your Honor. Thank you. Please rise.